We move to the third case this morning, LeDure v. Union Pacific Railroad. Mr. Wolfe, may it please the Court, my name is Nelson Wolfe. I represent Plaintiff Brad LeDure who brought this FELA case in the Southern District of Illinois. We're here today appealing the District Court's dismissal of the entire case on an order of summary judgment. The summary judgment should be reversed in its entirety, including specifically whether or not the locomotive at issue was in use so as to invoke the liberal provisions of negligence per se intended by Congress when it enacted the Locomotive Inspection Act as well as the FELA. We also submit that the District Court's order on summary judgment should be reversed with respect to all of the general negligence claims because there are genuine issues of material fact and there are substantial pieces of evidence which support the claim. Generally speaking, this Court's review should begin with how it can do justice to Congress's intent in enacting that long-standing legislation which has been mentioned already in cases here today and this Court has the benefit of case law to guide it. The FELA was enacted in the early 1900s as a broad humanitarian statute intended to be interpreted liberally to afford relief and remedies to railroad workers who are injured in the course of their job duties. The Locomotive Inspection Act was enacted soon thereafter and was specifically intended by Congress to broaden the scope of FELA's protection. But Counsel, we have to look at the text of the statute and not simply its purpose and all statutes are compromises and even though it had a remedial purpose, we still have to look at the compromise Congress struck and the language it chose. So how, can you talk a little bit about how you would shoehorn your argument into the requirement of use? Absolutely, Your Honor, and I would not suggest otherwise. I was merely suggesting that looking at Congress's intent becomes evident when you look at the plain language of the statute as well as how the United States Supreme Court has interpreted those statutes. But starting off with the language of the statute itself, it provides specifically that a railroad may use or allow to be used a locomotive on its railroad line only when it is in a condition and that it's inspected as required. So the language of the statute is directed to the actions of the railroad, not specifically to the individual employee. Starting from that standpoint, we consider the common use because it's not defined and perhaps Congress didn't think that a term like use needed to be defined. But under common parlance, for the railroad to use or to allow to be used a locomotive certainly would include utilizing a locomotive or railcar in connection with its interstate commerce. And by that definition alone, clearly the actions in this case where Mr. LaDure was injured when he slipped on oil while he was walking on the locomotive to enter its cab and turn the locomotive off. Well, that seems pretty broad and much broader than any other circuit applying a multi-factor test has taken it. I mean, wouldn't use and consistent with other circuits in the way that we've looked at the provision before mean used for the purpose for which a locomotive is used, which is to move along railroad tracks? I would respectfully disagree that it should have such a narrow interpretation, Your Honor. In fact, sometimes in understanding what a term means, it is helpful to look at what it does not mean. And so that's what most of the court cases have addressed is when it is not in use. And so, for example, this court in the Lyle and the Tisneros cases, both tracking each other, held that a locomotive was not in use when a mechanical or maintenance employee was injured at a maintenance facility, a roundhouse, or a shop while lubricating, fueling, or cleaning the locomotive. And in fact, in Tisneros, it was being taken to that facility. But here's my question. You just said that used for its purpose of affecting interstate commerce. Is that how you put it just now? I said that use can include utilization in connection with transportation in interstate commerce. Well, why wouldn't that be in connection with transportation in interstate commerce? Because everything you do to prepare a locomotive to head out or to be in shape for, etc., being used in interstate commerce has that connection to interstate commerce, even if not to the actual preparation or immediate preparation to be pushed along the tracks. Fair enough. And there certainly should be limitations on what in connection means. So by defining it leads to more questions and to what exactly constitutes the outer limits of in connection. And so this court in Lyle and Tisneros said that the location and the activity are important. And that's essentially what all of the other circuits, well, most of the other circuits have come down to focusing on and identifying when a locomotive is not in use. So fit into that framework, this court in those two previous cases, and one before it, held that where you have a maintenance employee, as opposed to Mr. Ledour, who is a transportation employee, that that is an important factor. Secondly, the activity involved in the injury event is the second consideration. And in both Lyle and Tisneros, the activities were far removed from being in connection with actual transportation in the sense that it was conducting maintenance or repair work. So the courts have made relatively clear that for individuals who are doing mechanical or electrical work, that is no longer being used by the railroad. And that's in contrast with the facts that we have in this case and in some other cases I can get to. But here in this case, this is a train that originated here in Chicago and was on its way to southeast Missouri with a stop in Salem, Illinois, for a crew change and to simply place out and to pick up a few rail cars. But the consist of three locomotives and the rest of that train was going to continue in its commerce. So even though we can quibble about what the outer extents of in use may mean, in this case it's clear that this locomotive was being used by the railroad as part of a train being moved in transition, as opposed to being set out somewhere in a repair track to be addressed by a classification of employees in the mechanical department. It was on an active service track within the rail yard. Whether it's on the back track or whether it's on the main line has held to be not a material or at least not a determinative factor by most of the courts that have addressed this. And that would be true of all the cases where in use has been found for the purpose of locomotives and rail cars that are involved in switching activities, which clearly wouldn't be on the main track because you have a number of tracks that are put together for the purpose of classifying trains. Was the locomotive idling during the trip? It was, according to the evidence, and more importantly, Your Honor, it's not a disputed issue for you to consider because Railroad's trial counsel, which is different than counsel here, admitted at the oral argument at summary judgment that it was idling and that was the reason Mr. Ledour was going back through these locomotives on the exterior platforms to turn it off and to put a tag on in the performance of his duties. A transportation worker encounters the exterior platforms of a locomotive essentially two times. One is at the beginning of the shift and one is at the end of the shift. And Congress saw fit through the Secretary of Transportation to enact these safety regulations that said that locomotives cannot be used unless they are kept free of oil or other modified, secure footing, and that you have to do an inspection every single day. An application to transportation workers for that to be given any kind of sense, and certainly the broader scope that I believe that Congress intended by enacting the Locomotive Inspection Act to expand, then that means that the locomotive engineer is entitled to rely upon the railroad in doing its job properly to make sure that the locomotive is free of oil, both at the front of the locomotive and when he's walking off the locomotive at the end of the shift. And the railroad's argument in this case is that there should be a hard line stop, that if the locomotive is not being prepared to be used, to be operated, then it doesn't apply whatsoever and that would lead to an absurd result of an employee being able to rely upon the railroad at the beginning of the shift but not at the end of the shift. So, Your Honor, if I can dovetail into some of the other court's decisions that helped to support Mr. Ledour's position here, the United States Supreme Court in the Rigsby and the Brady cases talk about in-use in the context of the Safety Appliance Act, which all courts have acknowledged the in-use analysis has application to the Locomotive Inspection Act. And in Rigsby, a switchman who does switching work, a transportation employee, was injured while descending a defective rail car after that car was being moved to a repair shop. So it wasn't being readied for transportation in the immediate sense, it would have been somewhere down the road, but even in that case, the United States Supreme Court said that the statute is so broad as to include that type of use and that type of location for being in use and it so helped. In other words, use, according to the Supreme Court, is much broader than simply operation of a locomotive. In Brady, the employee was injured when he was inspecting rail cars that had been delivered from St. Louis to East St. Louis and then if they were going to be found defective, then they're going to be sent back, not accepted, and otherwise they would continue on part of their journey. And again, the United States Supreme Court said in that case, that car was considered to be in use when the employee was injured when he was coming down from the rail car and a grab iron broke. If we look beyond this court's cases and we look to the other cases, the McGrath case, which was decided by the First Circuit, and I appreciate that's not binding on this court, but it certainly is instructive and has been decided by both sides, that the court there found that the locomotive was in use when the engineer slipped and fell while he was entering the cab of the locomotive to review the daily inspection card and the locomotive was idling on a rail yard track. The court considered those duties incidental to train operation duties, which again, Judge supports Congress's intent that this be a broader application than the narrow application that has been decided and urged by a defendant in this case. So you agree that if the definition is narrower, say, to being in use or immediately ready for use, that Mr. LeDore would lose? I don't agree with that, but I... It's a much harder case for him. Well, certainly. And I'm not sure if I understand your question completely. Are you saying he loses on the locomotive inspection? On the... Oh, right. I'm not talking about the FELA claim. Yes. The locomotive... The locomotive... You're well into your rebuttal time, you know. I'm sorry. I don't mean to detour you to a loss of rebuttal. Time flies when you're having fun. When you're having fun. I will reserve my time, then. Thank you.   Good morning, Your Honors. May it please the court. My name is Tim Eaton. I'm the attorney general of the Federal District. My name is Tim Eaton, and I'm here with my colleague, Jonathan Amarillo, on behalf of Union Pacific. Judge Barrett, let me address your first question to counsel, and that is, what is the purpose of the Act, before we get to the in-use? And the purpose of the Act is so that locomotives should be safe to operate in the service in which the same are put, that the same may be employed in the active service of such carrier. And when the courts have dealt with in-use, they're looking at whether or not this is a locomotive that's going to be operated safely. This court in Ward v. Sioux focused on that language when they're talking about safe operation. That was not an in-use case. That was a non-FELA case, but nevertheless, they were using that language. So the focus has been on whether or not it can be safely operated. When you look at this court's decision in Lyle, and you look at the facts there, the person who was actually a hostler helper was servicing the train for future use. He was getting it ready to be used. There was no imminent departure. In fact, I think the facts are in Lador, they didn't know when it was going to be leaving, and in fact, that was not part of the record. Likewise in Tisneros, I believe you had a person who was either to fire up or not at the fire, I think were the terms that they used in that case, getting it ready to use. But they still found that was not in use because where it was at the time and what was going on. In answer to your Honor's question, yes, this was on a backtrack. There was testimony of a Union Pacific employee who said that there was, that backtrack had been used at active service, which is what the plaintiff argues, but then he goes on to say within the yard, that most of the service of that track has been moving trains within that yard or cars or locomotives within that yard. So it was not something that was on the main line at all. In terms of whether or not it was immediately operational, there's two facts to focus on. One, the train had not been assembled. This train had come in. It was part of a consist, and it was standing on the backtrack. Train had not been assembled yet. In fact, Mr. Ledour, after his fall, was involved in a switching operation to put the train together so it could leave. And more importantly, when we're talking about whether it's safe to operate, you have a situation here where this locomotive was being tagged running dead. In fact, two locomotives were being tagged running dead by the plaintiff. There was only one locomotive in the consist that was actually pulling the train. So when we're talking about language, which the courts have used, active service, immediately ready to operate, safe to operate, you're talking about a train, a locomotive, that's going to be pulled along to another location for inspection and maintenance. It was being tagged running dead, and if I could quote from Lyle, it seems to me that that is the antithesis of being in use. That's what happened here. Counsel, you might not know the answer to this question, but it's striking to me that the cases that we have, anyway, focusing on this in-use requirement, are all quite old. How come this in-use requirement doesn't get litigated very much? Is it because people use FELA more than the Locomotive Inspector Act? Well, when they have a FELA claim available, I believe they're relying on that because of the liberal causation standard, frankly. You're right. I mean, Lyle was decided in 1949, and Tisneros was decided in 1952, and that's the last date that I see. Now, other circuits have weighed in on this, but even some of those cases are old. And I think it's, with all due respect to some of the other circuits, I think it's gotten out of control. For example, the Bryan case, which counsel cites, it was a Fifth Circuit case. In that case, the locomotive got into a collision. It was derailed. It was lying on its side. They were trying to re-rail it, was the term I think they used in the case, and during that re-railing process, an employee was injured. And they said that that locomotive was in use, even though it had been gutted by fire and was inoperable. The Fifth Circuit said it's in use. So that's kind of the extreme that I think we've gone to. I believe the Lyle and the Tisneros cases got it right, is that you have to look at whether or not it is in operation, which it seems to me there'd be no dispute if it's pulling a train, it's in operation, but immediately ready to operate. And that's what the district court decided, that in this case, because there needed to be further activity done, switching of cars, putting the train together, and then hooked up to the consist, that under Lyle and under Tisneros, it was not ready to go, and therefore they found it was not in use. Let me ask you a question. So this test, in use or immediately ready for operation, hasn't been articulated quite that way that I've seen in the other circuits, although I think that the multi-factor tests are consistent with it. Am I right about that, that no other circuit has articulated it precisely that way? Your Honor, what they seem to be relying upon is a totality of circumstances test. But some of the circuits, I think the fourth in particular in the Angle case and then later in the Dean case, they were looking at where it was in the process of being ready, but they were focusing on who was injured and where the locomotive was at the time. Those were the two factors they were looking at. And don't you think that gets to, like, they do have these, you know, totality of the circumstance tests, but don't you think that those tests are all getting to those points, the use or immediately ready for use? Yes, I do. And I think in this case, in applying the totality of the circumstances case, you have a train, excuse me, you have a locomotive that's not hooked up to a train yet, the switching has not occurred, it's on a back track, and the locomotive itself is being tagged as running dead. And it seems to me under that totality of the circumstances case that the district court was absolutely right in finding that it was not in use. Not focusing on necessarily the fact that this was an engineer, because the act doesn't distinguish between what their status is of the injured employee. The act doesn't say anything about that when they're talking about in use. The act also doesn't say where was the train at the time. Was it on a main line, was it on a back track, was it on a yard track? Those are things that the court has to consider, because there was one case out of the, I think it was the Northern District of Indiana, the Carter case, district court case, where it was actually on the main line, but it had been blue flagged. And so- It means that it was going to be under repair. In that case, I think a gauge, a gas gauge needed to be repaired or fixed, and so they're trying to keep other trains from going even near it, so there would be no collision. So they put up these big blue flags, so it's obvious that it's under repair. And so in that case, where it was or who it was didn't seem to make a difference. So I agree that it's a totality test, and I think when you look at what Lyle said in this circuit and then Tisneros, I think what the district court did was apply the proper test in looking at all the factors that were involved here. Second point is with respect to the FELA claim. The court also found summary judgment in favor of Union Pacific with respect to the FELA claim. Because what we are dealing here with is a small spot of oil of an unknown origin. In fact, when they went back and they looked at where he fell, they couldn't find any components in the cap as to where this oil could possibly have come. So under FELA, where you don't have negligence per se, like you might have if there was an LIAA violation, if that even applied, if it was in use, it's what is reasonably foreseeable. And reasonably foreseeable requires that there be some notice to Union Pacific. And in this case, there was certainly no actual notice. There's no argument about that. The issue that the plaintiff raises is that there was constructive notice. But there's absolutely no basis for constructive notice. The plaintiff was arguing, well, they should have inspected it. We don't know whether they would have found it during an inspection. When the plaintiff first walked by it, he didn't see it. He had a flashlight. He slipped, came back later. Where he fell, said it was a slippery area, that he slipped on something later on. There's been testimony by a UP employee. Yes, there was oil there. But there was never any connection stating that Union Pacific knew or would have known had they done an inspection. And in fact, that's very similar to this court's decision in Holbrook, where they found in that case where the railroad employee had slipped on a ladder that apparently had some slippery substance on it, there was no indication as to where that came from. In fact, there were oil ponds, I think, in the area, but it was not even close to where the ladder was. And what the court said, what this court said, and what the district court found here, is it would have been pure speculation to have said that that came from the train or it came from his boot. No one knew. So an inspection may not have turned it up. And absent any evidence that that inspection would have detected it, the district court correctly found that the FLA claim fails as well. So there's no negligence count here because it was not reasonably foreseeable. Finally, there's another issue which they raised. It deals with whether or not the tread was worn and whether or not that could have caused his fall. But the plaintiff testified himself, when I slipped on the oil, the tread didn't keep me from falling. That was his testimony. So if the oil wasn't there, we're not responsible for the oil, there's nothing that says, there's no indication in the record at all that he would slip but for the oil. He just said it didn't prevent my fall. So again, the district court was correct in finding that claim, once you've determined that the oil could have been found by Union Pacific, is out as well. And so we respectfully ask this court to affirm the district court. We believe that number one, under the LIA, this was not something that was in use. I think it would be stretching the definition of in use, active service, too far. And number two, we believe that the district court was right in entering a summary judgment on the FLA claim. Thank you very much. Thank you, counsel. Judge Barrett, you asked the question, why are these cases so old? Well, the real answer, I believe, is most likely because the United States Supreme Court made so clear in its early decisions in the 1930s that even a locomotive that was taken to a repair facility and the employee had secured it and was getting off and fell when he got off, that that would constitute adequate in use to invoke the protections of the strict liability statutes. And because railroads, in light of that, they weren't pressing the issue to challenge it and say that there should be exemption from liability. That's why you're not seeing the cases. And it's also true that the FLA expands, the LIA expands the FELA. And so what we see, even in the Seventh Circuit case, is not a narrow focus on whether or not the locomotive was in operation. Instead, this court focused on the type of employee, the location of the work and the activity that was being done. If it was a simple matter of just whether or not the locomotive was in operation, whether it was not, when it was getting serviced at the repair shop, just like your car gets its oil changed, the car's not on, then the court could have said that. But it didn't say that. This court went through the analysis of looking at the location, at the repair shop, looking at the activity, repair or maintenance. And that should be dispositive for this court and you shouldn't have to get tangled up into what all these other courts look at in different factual situations. And briefly, as to the FELA negligence claims, there's no dispute that the Supreme Court has said that this is to be interpreted broadly and that a jury determination is part of this. But on causation, right? On causation, which is the issue here. The issue here is foreseeability, right? That there's no, that you haven't introduced any evidence that the railroad knew or had reason to know that there was this puddle of something. Those are two issues. The defense counsel was suggesting that the presence of oil would somehow impair our claim as to the inadequate non-slip tread surface. So whether or not the non-slip tread surface caused or contributed to cause him to fall, no matter how slight the contribution was, that's a case for the jury. As to notice regarding the existence of the oil, we don't need to prove that. Actual notice is deemed to be established if the railroad itself created or allowed the condition to be created. And the irony here that should not escape this Court's attention is that the railroad is trying to claim the benefit of not having notice of oil when it clearly and admittedly violated the safety inspection of the Locomotive Inspection Act that requires it to inspect a locomotive every calendar day. It put this locomotive on the train, it was powered on, it was idling, and it didn't do its inspection on the day before it gave it to Mr. Ledour. And now it wants to seek a benefit from that by saying it didn't have notice. And that's what distinguishes this case from the Holbrook case and why it should be remanded on the FELA negligence claims as well for a jury to decide those issues. I see that my time is at the end, and if there aren't any further questions, I would simply close by asking this Court to reverse and to find that the locomotive was in use to give Mr. Ledour his day in court in front of a jury. Thank you. Thank you, counsel. Thanks to both counsel. The case is taken under advisement.